IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DIANNE JENKINS,

       Plaintiff,

v.                                     Civil Action No. 5:08CV134
                                     (Judge Stamp)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for

Summary Judgment or in the Alternative Remand and Defendant's Motion for Summary Judgment

and has been referred to the undersigned United States Magistrate Judge for submission of proposed

findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Dianne Jenkins ("Plaintiff") filed the subject application for SSI on January 20, 2005,

alleging disability beginning October 14, 2004 due to back, neck and shoulder pain. (R. 82-85). The

state agency denied her claim at all levels of administrative review. (R. 43-44, 67-71). Plaintiff

requested a hearing before the ALJ which was held on March 28, 2007. Plaintiff was represented

by counsel at the hearing. A vocational expert appeared and testified during the hearing. (R. 858-

914). The ALJ rendered his decision on June 5, 2007 finding Plaintiff could perform a limited

range of unskilled light work and, therefore, was not disabled within the meaning of the Act. (R. 20-35). The Appeals Council declined Plaintiff's request for review, making the decision of the ALJ the final decision of the Commissioner. (R. 7-10).

## II. Statement of Facts

Plaintiff was born February 5, 1966 and is now between 43 and 44 years of age (41 at the time of the ALJ's decision). As such she is a younger person as defined by 20 C.F.R. § 416.963.

Plaintiff completed high school taking special education classes throughout. She has prior work experience as a cosmetics distributor from 1988 to 1996, as a seamstress for a tent manufacturer from 1995 to 1997, and as a part-time school cook from 2002 to 2005. (R. 111, 140, 879, 881, 893-895).

Plaintiff contends she became disabled October 19, 2004 (R. 82) notwithstanding that she was employed part-time (three (3) eight (8) hour days per week) until October 2005[1] as a home aid to an elderly person where she provided light cooking and companionship. (R. 878-879, 881-884).

Plaintiff's submitted Medical Record reflects the following:

Plaintiff's prior disability claim filings were denied:

1)      July 15, 2003 denial based on Plaintiff's failure to supply medical evidence to establish disability.  R. 45, 72-74.

2)      June 13, 2005 denial based on Plaintiff's claims of "neck, back and arm pain syndrome" and "other disorders of the urinary tract."  R. 44, 67-69, 62-64.

3)      January 26, 2006 denial based on Plaintiff's claims of "neck and shoulder pain syndrome"

_____

[1]Portions of the record suggest Plaintiff worked as an elder care giver near to the ALJ hearing.  R. 194.

and "borderline intellectual functioning." R. 43.

Plaintiff retained the services of legal counsel to assist her in the prosecution of her claim for benefits on July 18, 2005. R. 38-42.

Plaintiff's earning record shows less than $800.00 per year annual earnings between 1983 and 1988, $900.00 to $1,000.00 annual earnings between 1989 and 1994, $7,493.14 reported earnings for 1995, $10,742.62 reported earnings for 1996, $2,740.95 reported earnings for 1997, less than $115.00 in reported earnings for 1998, 1999, 2000, and 2001 combined, and less the $1700.00 per year earnings reported for 2002, 2003 and 2004. R. 77, 78-81. Plaintiff listed her work as being a distributor of cosmetics between 1988 and 1996, a seamstress for a tent manufacturer between 1995 and 1997, and a substitute school cook between 2002 and September 2004. R. 111, 123, 149. Plaintiff has worked part-time providing in home care, including washing of dishes, washing of bedclothes and changing beds, preparing and serving meals and otherwise providing companion services to an elderly person. There is no social security record of earnings from this work. R. 192. In a typewritten statements dated March 22, 2007, signed by Evonne Moore, it is reported that Plaintiff worked as a "caregiver [sic] for Louise Beall 3 days a week" preparing light meals, seeing that Beall takes her medication that is prepared in a weekly dispenser, to comfort and call for assistance needed by Beall, and that Plaintiff "is not required to do any heavy lifting, or any other heavy work" and "[s]he will no longer be working with Louise Beall after March 31, 2007 do [sic] to her health." R. 194.

Plaintiff describes her daily activities in her adult function report dated October 21, 2005 as "take my son to bus stop, do house work (I do all the house chores cause I have no one else to do them), watch TV some, sew some, go to Dr. sometimes, go to store sometimes, visit family

sometimes." R. 161-168. In that report Plaintiff states: "I have not been able to wrok do [sic] to my back, neck, sholder [sic] pain also had surgrey [sic] done Oct 19-04 have not been able to work cause a hole in bladder have to have cather [sic] in. Just had another suragey [sic] done Aug. 9-05 not aloud [sic] to lift." R. 168. In a hand lettered note dated October 31, 2005, Teresa Jenkins, Plaintiff's sister, reports: "My sister Dianne Jenkins has a lot of pain in her neck, back, shoulders and in her legs sometimes. She stays tierd [sic] a lot. When walking she tiers [sic] quickly and has to stop. She has had a full hysterectomy and a whole [sic] in her baldder. She goes to the bathroom frequently. She can not work because of her medical conditions. She is a substitute cook for the schools in Gilmer County but is unable to work because she is under doctors care." R. 176. In a typewritten disability report-appeal form completed by her sister, Plaintiff reported: "When I lift anything I have pain in my mid abdominal area and left shoulder pain. I can't lift anything even a gallon of milk causes abdominal pain. If I try to carry anything for a few feet my arms go numb." R. 184-189. In a typewritten March 22, 2007 "to whom it may concern" letter Teresa Jenkins explains she helps Plaintiff fill out paperwork associated with her claim because Plaintiff lacks literacy skills in spelling and reading. R. 193.

As a 7 year old child between September 1973 and December 1973 Plaintiff was seen and successfully treated at the West Virginia Medical Center for bone destruction of her mandible secondary to non-malignant myxofibroma of the mandible, tooth decay and gingivitis. R. 197-200, 763-771.

January 8, 2001 A.R. Fogle, PA-C saw Plaintiff for followup on her complaints of shoulder and low back pain secondary to a work related injury. R. 491.

February 8, 2001 A.R. Fogle, PA-C saw Plaintiff for followup for back pain secondary to a

work injury and noted Plaintiff had not done any Pt and her functional capacity evaluation showed her to be non symptomatic. Plaintiff also complained of hip pain tender to palpation over the iliac crest. R. 489.

On March 8, 2001 Plaintiff was seen by A. Richard Fogle, PA-C of Gilmer Primary Care for followup of workman's compensation for chronic cervical shoulder muscle spasm and pain. Fogle reported speaking with PT Ickes who said he did not feel there was much improvement; he did not feel that the patient was doing her home exercises because she was having to be lead through them every time and has no increase at all in them. Fogle noted a functional capacity exam came back with "very neg result that she would not be able to return to her previous job. Was in the lower, lower percentile of any of the tests that they did perform." On exam Fogle noted Plaintiff "[a]ppears in no apparent distress." He also noted: "She is tender to palpation at the cervical trapezius area, C6-C7. Does c/o when you do that. She is able to move her neck freely when I am not discussing anything else w/ her about her neck." Fogle wrote for Plaintiff to return to modified work in 6 weeks and try to return to work after that." R. 488.

April 9, 1991 Braxton County Memorial Hospital removed Plaintiff's right Ovary due to a cyst and her appendix relative to complaints of chronic right lower quadrant pain. R. 215-216.

Records submitted by Plaintiff's counsel post ALJ hearing for Appeals Council consideration show Plaintiff presenting and being evaluated and treated by Gilmer Health Services for complaints of abdominal pain the physicians believed was related to PVD. On November 24, 1997 Plaintiff inquired if the pain could be related to a sprained back and indicated she was going to see a worker's compensation physician soon for her back. R. 772-815.

Plaintiff saw Paul Lattimer, D.C. for chiropractic treatment from March 4, 1997

(approximately 3 days post alleged March 1, 1997 work related injury at Panther Primitives/Panther Lodges) through her initial January 12, 1998 release to return to work at Panther. After working two days, Plaintiff presented to the ER at Braxton County Hospital complaining of numbness in her right arm and hand. On February 17, 1998 she again presented to Lattimer complaining of pain in the low back and tingling down both of her legs and numbness in her right arm and pain in her low cervical spine. Lattimer continued treating her from February 17, 1998 through September 28, 1999. R. 816-836.

A MRI performed on Plaintiff at United Hospital Center on March 29, 1998 found: "mild disc space narrowing seen at L3-4. There is a small limbus vertebra involving the superior margin of L4 anteriorly. Lumbar spine is well aligned. No abnormal vertebral signal is noted. Axial images at L2-3 and L3-4 show no abnormalities. L4-5 shows fairly marked facet degenerative change. Some hypertrophy of the ligamentum flavum. No significant canal stenosis is seen however. L5-S1 shows some degenerative changes of the facets as well. No HNP or spinal stenosis is noted. Fairly marked degenerative facets seen at L4-5. L5 appears to be transitional vertebra with partial sacralization on the left. This is confirmed by outside plain film radiographs from Braxton County dated 1/14/98." With respect to the cervical spine, the MRI was read as: "There is reversal of the lordotic curvature at C4-5, of uncertain etiology. The cord is of normal caliber and signal intensity. Axial images at C2-3, C3-4, C4-5 show no abnormalities. There is a central disc protrusion/herniation, very small in size, at C5-6 without significant impingement. C6-7 and C7-T1 appear unremarkable. Perhaps a very tiny central HNP, C5-7 without significant impingement. Reversal of the lordotic curvature of uncertain etiology or significance. No large HNP or spinal stenosis noted." R. 821-823.

Michael R. Condaras, D.C. evaluated Plaintiff twice: once on December 3, 1997 and later on September 20, 2000. In each evaluation he found Plaintiff: had reached maximum degree of medical improvement, no surgery was recommended, her to be permanently partially disabled (4% cervical and 5% lumbar in 1997 and 11% cervical and 8% lumbar in 2000), and required vocational retraining. R. 844-857.

On April 4, 1998, corrected October 6, 1998, Joseph A. Snead, M.D. Orthopedic Surgeon, saw Plaintiff for impairment evaluation. He evaluated Plaintiff to have a 23% whole person impairment and stated that he did not feel she would ever return to her former work at the tent factory and recommended that compensation send her to trade school to learn to do something like practical nursing. R. 838-840.

James D. Weinsten, M.D., Neurosurgeon, saw Plaintiff on May 15, 1998, reviewed both her cervical and lumbar MRI's, and concluded there was nothing operative in the neck and in the lumbar area there was no pathology except for some hypotrophy of the ligament of flavum at 4-5 and some relative stenosis at that level. He felt there was reason to do a lumbar myleogram/CAT scan to see if either of the L5 nerve roots is under compression from the relative stenosis although such a problem was not overt. R. 825.

Records submitted reflect she was seen on June 18, 1998 for DHHR physical for back and neck pain and records were released on August 18, 1998 to SSI. Records show Plaintiff was next seen on December 18, 1998 for complaints of breast soreness. Examination revealed no palpable breast abnormality. Plaintiff was on no medications at the time. On April 20, 2000 Dr. Dawlah saw Plaintiff for complaint of continuing upper back and shoulder pain secondary to lawn mowing. She was not having any difficulty with walking or ambulation and had no weakness in her hands or legs..

Exam of the thoracic lumbosacral spine shows some mild vague non specific tenderness with normal range of motion and negative SLR. The records reflect that Plaintiff continued to see the clinic physicians for complaints of abdominal pain, frequent urination and slight vaginal discharge through the winter and spring of 2000. Tests were negative for malignancy, UTI, neisseria gonorrhoeae, chlamydia trachomatis, but positive for a yeast infection. Plaintiff apparently filed a worker's compensation claim for her back as on July 1, 2000, she call the clinic asking if it has sent a letter to worker's compensation. In August 2000 Plaintiff requested stronger medication than the Naprosin she had been taking and had run out of for her back pain of a non-specific nature and asked that notes be sent to worker's compensation. On November 14, 2000 Plaintiff presented with complaints of neck hurting down into right shoulder, left shoulder hurting some and fingers hurting. Non-specific neck and back pain diagnosed. On November 17, 2000 Plaintiff called in wanting to know if she should have an x-ray or medication. On November 22, 2000 Plaintiff stated her neck pain appeared to be doing better but presented for removal of long standing lesions (moles) on the left side of her face and back. On January 8, 2001 Plaintiff presented for follow up of her shoulder and low back pain and to have worker's compensation forms filled out. On February 8, 2001 she presented for follow up of her shoulder and low back pain and the note indicates a functional capacity assessment showed no-symptoms. On this occasion, Gilmer referred Plaintiff To Minnie Hamilton health Care Center, Inc. R. 772-815.

April 27, 2001 Plaintiff seen by A. Richard Fogle, PA-C of Gilmer Primary Care for follow up on a worker's compensation injury to the back and neck. Plaintiff reported she had finished P.T. and "that it doesn't do any good." Fogle reported he had released her on March 8, 2001 to finish PT and a trial of full work. It was Fogle's stated opinion that "[P]t is able to return to light duty work

at anytime." In response to Plaintiff's complaint that she was having more LT shoulder pain than anything else, Fogle stated: "When I asked if this was her original injury area she said not that she remembers as it was so long ago." R. 487.

Plaintiff seen July 24, 2001 in followup to July 18, 2001 visit for acute lumbosacral strain worse in the left sacroiliac joint for which she had been given a shot of Toradol which provided immediate relief. On July 24th Saskia D. Kendziera, MS, PA-C of Gilmer Primary Care noted: "ROM is almost completely returned in her back and she is not having any pain radiating down her LT leg. She has not had any weakness, numbness or tingling, no bowel or bladder incontinence. She is in general feeling almost back to her baseline. Pt is currently out of work. This was a Workman's Comp injury... She does want to think about going back to work in the fall. She was released by Rick Fogle, PA-C back to work after a thorough examination by PT and was recommended for a work hardening program however pt decided against doing this. She would like to think about going back to work in the fall and states that she will think about a work hardening program at that time." R. 483-484, 485, 486.

November 21, 2001 Plaintiff seen by A.R. Fogle, PA-C of Gilmer Primary Care for UTI based on her assessment of her three day duration of increased frequency, dysuria and some pain. R. 482.

December 21, 2001 Plaintiff seen and treated by Saskia Kendziera, MS, PA-C for complaints of lightheadedness, pain in her teeth and pressure in her face. R. 480-481.

Plaintiff seen by MS, PA-C Saskia Kendziera on January 12, 2002 for well woman exam at which time density in the left breast and bulky uterus were noted. R. 478-479.

Plaintiff was seen by Susan E. Smith, M.D. FACS in 2002 for a lump in the left breast. It

was first noted in early 2002 and was medically followed by the doctor. It was diagnosed benign and disappeared completely by April 30, 2002. R. 314-317. A comparison mammogram was performed on April 18, 2005 which was read as "Stable mammogram. No mammographic evidence for malignancy. Benign." R. 328.

April 17, 2002 Plaintiff treated at Minnie Hamilton health Care Center, Inc. for left eye irritation resulting from a bug flying in to her eye. R. 477.

Plaintiff was treated May 15, 2002 at Gilmer Primary Care for URI and Herpes simplex on complaints of sores on her mouth and a dry scratchy throat. R. 475-476.

March 3, 2003 Plaintiff seen at Minnie Hamilton Health Care Center, Inc. for complaint of sharp pain in left breast 2 weeks prior which lasted a few hours and thereafter continued pain and tenderness in both breasts which was not associated with menses. It was noted that she had a left breast mass that spontaneously resolved the previous year. R. 473.

March 21, 2003 Plaintiff received sutures at Gilmer Primary Care for hatchet cut to knuckle and pointer finger. R. 474.

Plaintiff was referred to Dr. Sally R. Stewart by Dr. Kim Ferry of the Gilmer County Health Department on April 7, 2003 for a second colposcopy when the first colposcopy report for the Health Department reflected "normal cervix with no biopsies obtained and routine follow up recommended. R. 213. The pathology from the biopsies taken during the follow up colposcopy revealed the presence of cellular changes of HPV (LGSIL) prompting an assessment of "LGSIL of the cervix." R. 318. Plaintiff requested "cervical cryotherapy." R. 212. The cryotherapy was performed by Dr. Stewart on April 10, 2003. R. 211. Starting June 9, 2003 Plaintiff was treated by Dr. Stewart for periumbilical pain radiating into the epigastrium secondary to the cryotherapy. She was treated with

medications which apparently resolved her initial complaints. A repeat pap smear was negative for dysplasia. R. 207. Plaintiff was diagnosed with a hemangioma of the liver July 2, 2003. R. 220, 321. Dr. Sally R. Stewart, D.O. opined "no treatment or further studies may be indicated" but requested a second opinion from Dr. Ron Pearson. R. 221.

June 5, 2003 Plaintiff seen by Minnie Hamilton Health Care Center, Inc., for complaints of stomach pain on the right side near belly button. R. 472.

As a result of an August 27, 2003 evaluation and consultation (R. 259-260), Dr. Ron B. Pearson, M.D. removed Plaintiff's gall bladder and examined her liver through a laparoscopic cholecystectomy with no other abnormalities noted on September 16, 2003. He also performed a esophagogastroduodenoscopy with biopsy finding mild to moderate gastritis but no other abnormalities. R. 231-233, 261-271,312-313.

December 29, 2003 Plaintiff seen by Minnie Hamilton Health Care Center, Inc., for complaints of diarrhea, abdominal tenderness, flatulence, and right sided CP and pain at base of right posterior neck and occasional non-productive cough. R. 417.

December 31, 2003 chest and abdominal x-rays were normal. R. 494.

December 31, 2003 Plaintiff evaluated and treated by G. Benjamin Baker, PA-C for UTI (urinary tract infection), Anxiety and questionable IBS (irritable bowel syndrome) based on her complaints of shortness of breath (SOB), arms tingling, dry throat and mouth. R. 469.

January 5, 2004 Plaintiff seen on followup for December 31, 2003 complaints of anxiety, UTI and IBS. R. 470.

March 13, 2004 Plaintiff seen at Minnie Hamilton Health Care Center, Inc. for complaints of vaginal itching and burning of one month duration and incident thereto it was noted "c/o pain

upper back, shoulders." R. 468.

March 23, 2004 Plaintiff seen by G. Benjamin Baker, PA-C of Gilmer Primary Care for complaints of neck pain radiating across both shoulders, predominantly on the right. She reported having the pain "since 1987 off and on. She denied "any numbness, tingling or weakness in her upper extremities." She reported her pain "increased by what she describes as carrying a gallon of milk." X-rays of the cervical and thoracic spine were ordered. Physical therapy was recommended but Plaintiff said "she would like to wait on that as she has tried physical therapy in the past without success." R. 467. The thoracic x-rays showed "minimal scoliosis" and no "evidence of fracture or dislocation." R. 497. The cervical spine x-rays showed "loss of cervical lordosis most likely related to spasm. ... no evidence of fracture or dislocation. Disc spaces are within normal limits. Retropharngeal soft tissues are unremarkable." R. 498.

April 7, 2004 Plaintiff evaluated and treated by Teresa Ritchie, FNP-C of Gilmer Primary Care for bacterial vaginosis and complaints of frequency in urination and some vaginal itching she feared was the result of an infection she and her partner were passing back and forth. R. 466.

On April 24, 2004 she was seen by Dr. Stewart for complaints of pelvic pain of uncertain etiology and diagnosed and treated for bacterial vaginosis. R. 206, 322-327. She received continued treatment May 20, 2004 and July 6, 2004. R. 2003-205. Because of continuing complaints of epigastric and right upper quadrant pain, an ultra sound was done. It showed "no evidence of hydronephrosis" in the right kidney, "no evidence of pancreativ mass or pseudocyst," "no evidence of gallstones," but "a large area of increased echogenicity in the right lobe of the liver" indicating the possibility of a hemangioma, or regenerative nodule, or neoplasm. (R.201-202). A CT of the abdomen was done. R. 218.

A transabdominal and tansvaginal ultrasound of Plaintiff's pelvis was performed on May 17, 2004 with findings of a "small fibroid in the right lateral uterine wall , suspect complex cyst in the left ovary measuring 2.4 X 2.3 X2.1 CM with a recommendation of a followup in two months.  R. 222.

On September 21, 2004 Dr. Ron B. Pearson, M.D. performed a colonoscopy on Plaintiff which was negative.  R. 229-230, 256-257.

As a result of several months of having problems with abdominal pain associated with menstrual periods radiating into Plaintiffs back and an ultra sound showing an enlarged uterus, on October 6, 2004 Dr. Ron B. Pearson advised Plaintiff concerning the benefits and risks of a total hysterectomy.  R. 253-254.  On October 19, 2004 Dr. Ron B. Pearson, M.D. surgically performed a total abdominal hysterectomy and removed Plaintiff's left ovary.  R. 227, 247, 249-250.  Biopsies of the removed  fallopian tube, left ovary, uterus and cervix were performed.  R.234-237, 251-252. During the procedure Plaintiff's bladder was nicked and repaired.  Blood chemistry was performed. R. 238-239.  Chest x-ray was unremarkable.  R. 240-24.  After the procedure, Plaintiff complained and was treated with Ditropan for a weak bladder.  R. 299-307.

November 8, 2004 Plaintiff and her son were seen and treated at Gilmer Primary Care by Gene Benjamin Baker, PA-C, with "Z-Pak as the patient's insistence to take as directed" for complaint of scratchy sore throat, runny nose and intermittent congestion.  R. 465.

December 3, 2004 Plaintiff consulted with Gene Benjamin Baker, PA-C at Gilmer Primary Care for smoking cessation.  R. 464.

Plaintiff saw Chadwick Smith, M.D. on January 11, 2005 for a referral to a urologist for incontinence.  There is no other complaint mentioned.  R. 419.  Plaintiff was seen on May 20, 2005

by Dr. Smith for complains of back pain, neck pain and shoulder pain. Plaintiff reported "the left shoulder has been causing her pain for a number of years now. She states that her neck and back are also now causing her pain." The x-rays are negative "with just some minor degeneration of the disc." At the time of the examination Plaintiff had not lost any strength in her legs, had not had any kind of other bowel or bladder dysfunction than the leaky bladder for which she was being treated by Dr. Serrato, and could move her shoulder freely. R. 415. DMD Jack Krajekian consulted with Plaintiff from 2004 through January 18, 2005 relative to a lesion in her mandible and after surgical removal of teeth and biopsy he again consulted on Plaintiff's interest in the placement of endosseous dental implants in the anterior mandible and also for implant placement in the area of # 19. DMD Krajekian noted: "The patient will consult her finances and return to us for treatment." R. 272-289.

Plaintiff was seen by Chadwick Smith, M.D. on January 27, 2005 complaining of incontinence. She received a change in prescription; was advised to follow-up with her urologist; and received the work excuse she had requested. R. 463. No other complaints were noted at that time.

March 18, 2005 Plaintiff had dialation of her urethra, cystoscopy, upper endoscopy, bladder biopsy with fulguration, retrograde pyelogram and instillation of methylene blue into the bladder to localize the vesicovaginal fistula performed by Jose M. Serrato, M.D. As a result Plaintiff was diagnosed with unrinary incontinence, urethral stricture plus urinary tract infection, cystitis, but no vesicovaginal fistula was found. R. 290-298. On April 13, 2005 a voiding cystogram was performed on Plaintiff revealing the presence of a vesicovaginal fistula. R. 337. Dr. Serrato performed a cystoscopy, panendoscopy, bilateral retrograde pyelogram, bladder biopsy with fulgaration and cauterization of vesicovaginal fistula tract on April 20, 2005. R. 363-364. On April 26, 2005 Dr.

Serrato reported he had examined Plaintiff and found her to be normal with respect to her senses, musculoskeletal movements (gait and station, fine motor ability, gross motor ability, joints (swelling, effusion, tenderness, et.)), neurological (reflexes, sensory deficits, motor strength, coordination, frequency os seizures, blackouts, etc., mental status), respiratory, cardiovascular, and digestive except for a bladder leakage. R. 330-331. On May 15, 2005 Plaintiff had her Foley catheter replaced without difficulty at the emergency department of the Charleston Area Medical Center and was discharged to follow-up care with Dr. Serrato. R. 346. Plaintiff was fluoroed in the AP and lateral projections on May 27, 2005 and she was able to void the 250 cc of contrast material completely in spite of a small fistulous communication with the upper vagina. R. 341. (Total Record 333-399).

On April 2, 2005 Plaintiff was seen by Gene Benjamin Baker, PA-C for complaints of leaking around the Foley catheter. No other complaints are noted. R. 462.

Plaintiff was seen by Zubaer M. Dawlah, M.D. on April 6, 2005 for complaints of sinus congestion. Although she noted she was having discomfort on in the right upper outer area of her breast and trouble with leakage around the urinary catheter, she did not mention problems with her back, shoulders or hips. R. 461.

April 8, 2005 final CT with contrast of abdomen and pelvis showed 7 cm diameter mass in the peripheral right lobe of liver suggestive of a benign hemangioma; unremarkable spleen, pancreas, adrenal glands, kidneys, bowel; 2 cm diameter cystic structure in pelvis which could be Foley catheter, small bowel prominent in size with no definite dilated loops and normal mucosa and no acute process seen. R. 502.

Plaintiff was seen by G. Benjamin Baker, PA-C on April 28, 2005 for complaints of difficulty falling asleep. He started her on Lexapro and Vistaril with instructions to return in 2-3 weeks or

sooner is she got any worse or experienced new symptoms.  R. 459.

On May 18, 2005 Plaintiff had three x-ray views of her cervical spine taken and compared to x-rays made on March 23, 2004.  The mild degenerative disc disease had unchanged and the '05 x-rays showed "mild disc space narrowing at C4-5 and C5-6; no fractures; straightening of the normal cervical lordosis unchanged; and normal paravertebral soft tissues.  R. 421.  X-rays of the left shoulder showed the bony structures to be within normal limits; no evidence of significant degenerative or inflammatory changes; and the overlying soft tissue shadows were unremarkable.  R. 422.  X-rays of the lumbar spine showed mild rotatory scoliosis of the lumbar spine; vertebral body and vertebral disc heights preserved; no fractures; and patent neural foramina. R. 423.

On May 26, 2005 Arturo Sabio, M.D. a state agency physician, examined and evaluated Plaintiff.  He concluded "there was tenderness over the cervical spine, thoracic spine and lumbar spine.  There was tenderness over the left superior trapezius muscle.  There was some restriction of flexion and extension of the cervical spine; 30 degrees of flexion and 40 degrees of extension were demonstrated.  Lateral rotation is normal to 80 degrees on the left and 80 degrees on the right.  The rest of the joints in the upper extremities were normal.  The shoulders, elbows, wrists and hands showed normal ranges of motion.  Straight leg raising is abnormal to only 80 degrees because of pain in the lumbar spine.  Lumbar flexion forward is only 70 degrees and 10 laterally to either side, restricted by pain in the lumbar spine.  The claimant walked with a normal gait, and she did not require any ambulatory aids.  She is able to walk on the heels, the toes and heel-to-toe in tandem.  She is able to stand on either leg separately, and she is able to squat fully.  There is no evidence of upper motor neuron injury.  There was no muscle atrophy or weakness.  Neurological examination was entirely normal."  R. 400-404.

June 7, 2005 Fulvio R. Franyutti, M.D. performed a physical residual functional capacity

assessment on Plaintiff finding: only occasional postural limitations; no manipulative, visual, and communicative limitations; no environmental limitations except Plaintiff should avoid concentrated exposure to extreme cold and extreme heat. The doctor found Plaintiff partially credible concluding that the medical evidence partially supports her complaints and therefor reduced her RFC to light. R.405-412.

Plaintiff was discharged from physical therapy after five visits (June 6, 2005 to June 22, 2005) due to failure to improve as expected because of lack of compliance. R. 424-433. Plaintiff had prior successful physical therapy between April 1, 2004 and May 18, 2004. She was discharged because she had significant improvement in her functions and control and had returned to her pre-onset level of activity without modification. R 434-442. Plaintiff also had 7 treatments of physical therapy between February 13, 2001 and March 13, 2001 for complaints of back shoulder and hip pain. R. 445-454.

On August 4, 2005 Linda McPherson opined Plaintiff "has multiple problems at this time which makes it difficult to work - indwelling catheter needs proper attention to avoid increased risk of kidney disease." R. 456.

Plaintiff was seen and evaluated by Dr. Stanley Zaslau , WVU Section of Urology, on July 6, 2005 for her continuing leakage of urine from the vagina post October 2004 hysterectomy by Dr. Pearson and the unsuccessful attempts at resolution by Dr. Serrato. R. 541-541, 570-574. Plaintiff had vesicovaginal fistula repair at WVU on August 9, 2005. R. 555-567. Six days post op and thereafter to September 2005 she appeared to be healing well and there was no evidence of the vesicovaginal fistula or leakage. R. 544-551,552-554, 568-585. As a result, Dr. Zaslau, who treated Plaintiff from June 27, 2005, released Plaintiff to return to work on Monday, September 19, 2005 with a restriction that she not lift more than 20 pounds. R. 653.

September 16, 2005 CT's of the chest, cervical spine and Bilateral shoulders without contrast were normal except for the previously noted 6 cm diameter ovoid mass lesion on the right lobe of the liver felt to be a benign hemangioma. R. 633. The report noted a normal appearing cervical spine with ne evidence of fracture. The cervical neural canal was noted as well maintained. Mild posterior spondyloses were seen at the lower cervical spine (C5-6 and C6-7) and paraspinal soft tissues were unremarkable. R. 586-588.

An October 31, 2005 bone density test of Plaintiff's right wrist was entirely within normal limits showing no evidence of osteoporosis or osteopenia. R. 649.

On November 14, 2005 and again on December 19, 2005 and again on March 13, 2006, Dr. Zaslau saw Plaintiff as scheduled on September 15th and found that Plaintiff was 3 months post op, felt great, had not used a pad since the surgery, was voiding with a good stream and post void residual was "0." R. 654, 656 and 658.

December 1, 2005 Dr. Thomas Lauderman did a physical residual functional capacity assessment of Plaintiff. He found: she could occasional lift 20 pounds; frequently lift 10 pounds; stand or walk about 6 hours out of 8; could sit with normal breaks 6 hours out of 8; had unlimited push or pull operation ability; could occasionally climb, balance, stoop, kneel, couch, and crawl; had no manipulative, visual or communicative limitations; and should avoid concentrated exposure to extreme cold and heat but was otherwise unlimited with respect to environmental conditions. Dr. Lauderman noted Plaintiff had FROM (full range of motion) in her neck, back and shoulders with some crepitus in the shoulders, mild rotary scoliosis by lumbar x-ray; mildly decreased step length on the left; decreased average range of motion of the c-spine and lumbar spine; shoulder flex 170-176 degrees; abduction left 120 and right 166 degrees; only able to squat 1/4 and decreased strength in the left shoulder. He also noted the recent surgery to repair and correct vaginal drainage and a cystogram showing success of the procedure; ct spine with mild spondyloses without neural

encroachment or impingement. R. 589-597.

Plaintiff was evaluated by Lois Holloway, M.S. for the West Virginia Disability Determination Service on December 28, 2005. Plaintiff was tested using WAIS-III and found to have borderline intellectual functioning with a full scale IQ of 74 and a performance IQ (80) scoring better than her verbal IQ (71). Plaintiff was oriented x 4; depressed mood; thought was within normal limits without evidence of obsessions, phobias, delusions, preoccupations, hallucinations, illusions, suicidal or homicidal ideations; concentration was mildly deficient; immediate memory was within normal limits; recent memory was moderately deficient as was remote memory and judgment; persistence and social functioning were within normal limits and pace was mildly slow. Plaintiff did exhibit thoughts of helplessness and hopelessness. Holloway opined that Plaintiff would require assistance to adequately manage funds if benefits were awarded. R. 598-603.

January 26, 2006 Frank Roman, ED did a mental residual functional capacity assessment of Plaintiff finding: no marked limitations and only moderately limited with respect t0 her ability to: understand and remember and carry out detailed instructions; maintain attention and concentration for extended periods. Notwithstanding the findings, Roman did not find Plaintiff met the criteria for 12.04 affective disorder or any other mental impairment. R. 608-621.

Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on May 3, 2006 complaining that she thought the hole in her bladder was back. Her physical exam was normal. Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on May 5, 2006 complaining of stomach, back and crotch hurting. A pelvic exam revealed white discharge without lesions or nodules. Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on May 12, 2006 complaining of stomach pain. Tests were ordered but no masses were found on palpation. An ultrasound performed May 19, 2006 was negative except for the hemangioma of the liver. A later

May 24, 2006 MRI of the liver established a benign hemangioma with no further follow up or imaging required. R. 728. Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on July 1, 2006 complaining of muscle spasm in neck and shoulders. Palpable muscle tension found in left neck and shoulder. Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on July 5, 2006 complaining of neck and her shoulder feeling like something was pinching. On palpation, Plaintiff's left trapezious muscle was found to be tight and very tender. Three x-view x-rays of the cervical spine demonstrated normal bony alignment, no fracture, and disc space narrowing and degenerative changes in C5-6 and C6-7 levels. Views of the left shoulder showed bony structures within normal limits with no evidence of acute fracture or dislocation and no evidence of significant degenerative or inflammatory changes, the overlying soft tissue shadows being unremarkable. Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on July 10, 2006 wanting to discuss finding warts on her vagina. Watchful waiting was recommended. Plaintiff appeared at the Minnie Hamilton Health Care Center, Inc. on September 11, 2006 complaining of neck pain and head aches. Palpation revealed very tight and tender trapezious muscles. October 14, 2006 Plaintiff presented to the Minnie Hamilton Health Care Center, Inc. complaining of pain in the neck, shoulders and left elbow. R. 709-724.

An October 27, 2007 MRI of Plaintiff's cervical spine reflected posterior spurring and accompanying disc material at C4-5 and C5-6 levels with moderate canal stenosis described as effacing the ventral CSF space and a small left parmedian disc protrusion at C6-7. R. 725-726.

December 18, 2006 Plaintiff presented to Minnie Hamilton Health Care Center, Inc. complaining that her significant other was having relations with another woman; feared STD's and wanted to be tested for STD's.

December 27, 2006 Dr. Joseph Voelker of WVU Department of Neurosurgery examined

Plaintiff at the request of Gilmer Primary Care. He diagnosed Plaintiff with cervical spondylosis, degenerative disk and joint disease without frank herniation of the nucleus pulposis or nerve root compression. He noted that Plaintiff had a normal neurological exam and therefore recommended no surgery. R. 670-673.

Plaintiff was Seen January 19, 2007 at the Minnie Hamilton Health Care Center, Inc. for complaints of low back pain with palpable tenderness in the lumbar right flank area. R. 712.

On referral from Plaintiff's Social Security Claim Attorney, Joy Butcher-Winfree M.A. and Tony Goudy Ph.D. performed a psychological evaluation on Plaintiff dated February 21, 2007. In addition to an extensive listing of Plaintiff's medical records and past medical history, the WAIS-III test was administered with Plaintiff scoring a verbal of 72, performance of 94 and a full scale IQ of 80 placing her at low average. The evaluators explained a 95% chance exists that Plaintiff's true IQ falls in the range between 76 and 84 (low average). Plaintiff was also administered the WRAT-IV test which produced scores reflective of where she was in special education and were consistent with her IQ scores. Plaintiff was also administered the MMPI-2 test. The results were deemed invalid. The evaluators opined Plaintiff met the criteria for a diagnosis of Somatization Disorder 12.07 and Personality Disorder 12.08 because it "is not uncommon for this disorder to be an exaggeration and symptoms associated with the previously cured physical disease such as in Ms. Jenkins {sic] case, as evidenced by continual pain in back neck and shoulders and subsequent treatments after nonconclusive evidence from CT scans and radiology; urinary incontinence after vesigovaginal fistula repair, continual reported pain after hysterectomy, gallbladder, and tubal ligation. This disorder is often comorbid with major depression, panic disorder, mania and phobias, all of which are evidence in Ms. Jenkins' chief complaints." R. 674-708.

Plaintiff was again seen February 12, 2007, February 23, 2007, and February 26, 2007 by

Minnie Hamilton Health Care Center, Inc. for neck pain, referral for point injection and expressing her desire for injections for complaints of neck and shoulder pain, pain between the shoulder blades and in the bend of the right knee. She was diagnosed with fibromyalgia, hyper symptomatic and insomnia. Lopressor 50 and Deseryl 50 were prescribed. R. 195-196, 709-711.

March 23, 2007 Dr. Kline filled out a "Primary Care Physician Questionnaire." Dr. Kline opined Plaintiff was 1) not capable of walking standing most of the time lifting 50 pounds frequently and up to 100 pounds occasionally; 2) not capable of walking and standing most of the time lifting 25 pounds frequently and up to 50 pounds occasionally; 3) not capable of a significant amount of walking and standing lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and pulling; 4) not capable of sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds; 5) not capable of work for an hour or more before rest; 6) capable of standing or walking 15 minutes at a time; 7) capable of walking and standing in combination for an hour or less; 8) required to shift positions frequently because of pain and for pain relief ; 9) not capable of ever stooping or bending , kneeling, crouching, crawling, stretching or squatting; 10) capable of infrequently climbing and reaching; 11) restricted from machinery, jarring or vibrations, cold or hot temperatures; 12) advised to have frequent rest periods during the day and would be expected to experience chronic moderated to severe pain; and 13) capable of using feet and hands on a limited time basis. This form was prepared by counsel for Plaintiff and submitted to Dr. Kline to fill out. Dr. Kline declined to express an opinion that the degree of impairments he found on March 23, 2007 were the same as existed on 10/19/04; or that he expected those impairments to last for at least 12 months; or that Plaintiff was disabled from all full time work activity on 10/19/04 and continued to be so disabled to March 23, 2007. Dr. Kline expressed his opinion that Plaintiff did not "have any degree of 'functional overlay' i.e., does [not] have a mental impairment that in

combination with his other impairments result in a greater degree of disability that either the physical or mental impairment alone would indicate." R. 729-736.

March 28, 2007 Plaintiff was seen at Minnie Hamilton Health Care Center, Inc., for complaints of right posterior knee pain and knot following a long car trip and was prescribed ibuprofen for palpable tenderness pf posterior right knee. R. 739. An ultra sound of the right knee was scheduled and performed on April 4, 2007 finding "[n]ormal sonographic examination of the right popliteal fossa." R. 740.

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.     The claimant has not definitively engaged in 'substantial gainful activity' at any time during the period at issue herein, i.e., since January 20, 2005 (20 CFR § 416.920(b) and 416.971 *et seq.*).

2.     During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are 'severe' and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: mild degenerative disc/joint disease; history of hypertension; residual effects, status post October 2004 hysterectomy, August 2005 vesicovaginal fistula repair and multiple bladder repairs; history of headaches, by report; borderline intellectual functioning; and anxiety/depression (20 CFR §§ 404.1520(c)).

3.     During the period at issue, the claimant has no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR § 416.920(d), 416.925 and 416.926).

4.     Throughout the period at issue, the claimant has had at least the residual functional capacity to perform a range of work activity that: requires no more than a 'light' level of physical exertion; affords opportunity for brief (one -to two-minute) changes of position at least every half-hour; requires no climbing of ladders, ramps, ropes, scaffolds or stairs; requires no more than occasional balancing, crawling, crouching, kneeling or stooping; entails no exposure to temperature extremes or workplace hazards (e.g., dangerous moving machinery, unprotected heights); requires no rotation of the head or

neck more than 15 degrees in any direction (i.e., a 30 -degree range of either side-to-side or up/down motion); requires no overhead grasping, lifting or reaching; requires no close concentration or attention to detail for extended periods; requires no close interaction with the general public or more than occasional close interaction with coworkers or supervisors; requires no reading/writing at more than a fourth grade level, or arithmetic/mathematics at more than a fifth grade level; and accommodates up to one unscheduled workday absence per month (20 CFR § 416.920(e)).

5.　　Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of her 'vocationally relevant past work' as a sewing machine operator (20 CFR § 416.965).

6.　　The claimant throughout the period at issue is appropriately considered for decisional purposes as a 'younger individual' (20 CFR § 416.963).

7.　　The claimant has attained a 'high school' education in special education and is able to communicate in English (20 CFR § 416.964).

8.　　The claimant's [sic] has acquired no job skills that are transferable to any occupation which has remained within her residual functional capacity to perform during the period at issue (20 CFR §404.1568).

9.　　Considering the claimant's age category, level of education, work experience and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR § 416.960(c) and 416.966).

10.　　The claimant has not been under a 'disability,' as defined in the Social Security Act, at any time during the period at issue herein, i.e., since January 20, 2005 (20 CFR § 416.920(g)).


## IV.  Contentions

A.　　Plaintiff contends substantial evidence does not support the Administrative Law Judge's conclusion that she was not disabled for the period at issue because:

1.　　The ALJ did not properly evaluate claimant's impairment under Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).

2.　　The ALJ minimized claimant's back impairment by generalizing claimant's multiple impairments and lumping them together as "mild degenerative disc/joint disease."

3.　　Claimant was not afforded a fair and unbiased hearing.

4.      The ALJ failed to follow the precepts of SSR96-7p.

5.      The ALJ's opinion is based on an incomplete and inadequate hypothetical question posed to the VE.[2]

B.      Defendant contends substantial evidence supports the ALJ's finding of no disability during the relevant time period because:

1.      Substantial evidence supports the Commissioner's residual functional capacity determination and finding of non-disability.

2.      The ALJ properly evaluated Plaintiff's impairments.

3.      The ALJ properly evaluated Plaintiff's subjective complaints under the regulations.

4.      The ALJ properly relied on vocational evidence to evaluate Plaintiff's claim.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the

_____

[2]Plaintiff's five (5) contentions are combined into the three (3) basic arguments Plaintiff presented in her Motion For Summary Judgment.

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

1.    Evaluation of Impairments/Listing

At step two of the sequential evaluation, Plaintiff bears the burden of production and proof that she had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b), 416.921(b).

42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F) provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process." (Emphasis added).

The Fourth Circuit held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragmentize them. Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which,

26

taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."); DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983) (noting at page 150 that the most egregious error made by the ALJ was his "failure to analyze the cumulative or synergistic affect DeLoatche's various maladies have on her ability to work"). "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Walker, supra, at page 50.

In paragraph 3 of the ALJ's Decision, he concluded: "During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listen in Appendix 1, SubpartP, Regulation No. 4 (20 CFR § 416.920(d), 416.925 and 416.926." R. 24. In reaching the conclusion the ALJ states another conclusion: "... the undersigned has appropriately evaluated medical and other evidence pertaining to the claimant's medially determinable impairments in conjunction with all severity criteria contained within the 1.00 Musculoskeletal System (including listing 1.04 Disorders of the spine), 4.00 Cardiovascular System, 6.00 Genito-Urinary System, 11.00 Neurological and 12.00 Mental Disorders (including listings 12.02 Organic Mental Disorders, 12.04 Affective Disorders, 12.05 Mental Retardation and 12.06 Anxiety-Related Disorders) series of listed impairments."

Upon reaching the stated conclusions, the ALJ proceeded to explain in some detail that he 1) did not find the Plaintiff fully credible and why and 2) her symptoms sometimes suggested "a greater level of severity of impairment that can be shown by the objective medical evidence alone." R. 25-28.

The ALJ conceded the Plaintiff had "medically determinable impairments that could reasonably be expected to cause some of the symptoms described, and [he] believes that the claimant

does experience some back, neck, shoulder and other aches and pains, occasional headaches anxiety/depression from time to time, but not to the frequency or debilitating degree of severity alleged." R. 29. The ALJ analyzed some of the objective medical evidence of record including: a CT of Plaintiff's cervical spine dated September 16, 2005 indicating mild degenerative arthritis with posterior spondyloses at C5-6 and C6-7 without acute bony injury; a cervical MRI dated October 27, 2006 indicating some positive findings; a follow-up neurological evaluation dated December 20, 2006 showing Plaintiff was able to ambulate with a steady gait and care for an elderly person; and Dr. Joseph Voelker's interpretation of the imaging study to show only "mild" disc bulge at C4-6 and C5-6 without nerve compression. R. 29. The ALJ noted the inconsistency between the absence of any claim of debilitating psychological symptoms or learning disorder in connection with or prior to her 2005 SSI application and her present claim for psychological disability as a "plausible basis to support a compensable disability claim." R. 30. The ALJ noted Plaintiff was able to ambulate with normal gait, squat fully, and stand on either leg separately in May 2005; was determined to be fit to return to work by Dr. Stanley Zaslau on September 15, 2005; and that when she was evaluated on March 10, 2006, there was no evidence of back pain on straight leg raising testing, had normal ranges of motion, was observed to sit up from laying flat without any difficulty and reported no pain from spasm notwithstanding that she announced she was "trying to get SSI." R. 30-31.

While the ALJ could have done a better job analyzing the record and explaining why the objective evidence of record did not cause incapacity or pain to the extent claimed without relying so much on Plaintiff's obvious and proven lack of credibility, what he did review is within the record and is substantially supported by the record evidence as a whole. ( R. 488, 816-836 v. 821-823, 844-857, 825, 722-815, 487, 483-486, 467, 497-498, 415, 423, 400-404, 405-412, 586-588 and 589-597 - synopses provided on pages 5-20 herein).

In short, with respect to Plaintiff's lumbar spine, cervical spine and shoulders, the record generally shows that Plaintiff complained of pain in her shoulder, neck and low back from 1997 to the date of the ALJ decision, but the objective medical tests and clinical findings for the same time frame substantially support the ALJ's determination that there were no objective bases for the degree of subjective pain alleged or the degree of disabilities subjectively claimed to result. R. 488, 816-836, 821-823, 844-847, 838-840, 825, 722-815, 487, 483-486, 467, 497, 498, 419, 415, 421, 422, 423, 400-404, 405, 405-412, 434-442, 633, 586-588, 589-597 709-724, 725-726, 670-673, and 712.

The record establishes actual inconsistencies between the claims made by Plaintiff and the findings and observations made by the medical provider at the time. R. 488, 722-815, 487, 483-486, 415, 400-404, and 670-673. The record establishes a history of refusal of recommended treatment or non-compliance with recommended treatment (physical therapy) that had proven success with respect to Plaintiff's claimed cervical, lumbar and shoulder complaints. R. 488, 487, 483-486, 424-433, 434-442 and 445-454.

Listing 1.04 provides: *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by

appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

On December 27, 2006 Dr. Joseph Voelker of the WVU Department of Neurosurgery diagnosed Plaintiff with cervical spondylosis, degenerative disk and joint disease **without frank herniation of the nucleus pulposis or nerve root compression.** (Emphasis Added). At that time Plaintiff's neurological exam was normal. R. 670–673. On December 1, 2005 Plaintiff had full range of motion in her neck, back and shoulders and a CT of her spine showed mild spondyloses **without neural encroachment or impingement**. (Emphasis Added) R. 589-597. On May 26, 2005 examination of Plaintiff revealed that she walked with normal gait; did not require ambulatory aids; was able to walk on heels, toes and heels to toes in tandem; was able to stand on either leg separately; was able to fully squat; exhibited no evidence of upper motor neuron injury; suffered no muscle atrophy or weakness and had an entirely normal neurological examination. R. 400-404.

In short, the longitudinal record shows Plaintiff did not even meet the threshold of a 1.04 listing. The record contains substantial evidence that there was no resulting ... compromise of a nerve root (including the cauda equina) or the spinal cord. The record contains substantial evidence that there was no associated atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss.... The record contains substantial evidence that there was no Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting

in inability to ambulate effectively, as defined in 1.00B2b.

In <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983), the court held:

> . . . A claimant who establishes that he suffers from one of these impairments will be considered disabled without further inquiry. If a claimant suffers from a less severe impairment, the Secretary must determine whether the claimant retains the ability to perform either his former work or some less demanding employment. If a claimant can pursue his former occupation, he is not entitled to disability benefits. If he cannot, the Secretary must determine whether the claimant retains the capacity to pursue less demanding work. (Citations omitted).

In the instant case, after considering the substantial evidence in the record that Plaintiff did not meet or equal a listing with respect to her claimed spinal and musculoskeletal conditions, the ALJ appropriately proceeded with an analysis of Plaintiff's ability to perform other less demanding work in accord with the directive of <u>Heckler v. Campbell</u>, *Id.*

2.      Fair and Unbiased Hearing/SSR96-7p

SSR 96-7p states:

PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and

functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Plaintiff complains that the ALJ used language in his opinion that showed he was biased against her and to support her claim that the ALJ ignored the impact of her limited IQ. DE12 p. 11.

Notwithstanding the ALJ's frequent challenge of Plaintiff's credibility and motivations, the record substantially supports those challenges and establishes this as a case where the subjective symptoms of disability stand alone and are not always consistent and are not supported by the medical signs and laboratory findings. *Id.*

Pursuant to 20 C.F.R. §416.929 (a) the ALJ may not find a claimant disabled on subjective complaints and symptoms alone. There must be objective signs and laboratory findings which show

that a claimant has a medical impairment that could reasonable be expected to produce the pain or other symptoms alleged.

The ALJ has a regulatory duty to evaluate the subjective and objective evidence in the record and determine whether one supports the other and if so, what disability exists. The undersigned submits that the ALJ's questioning of Plaintiff's credibility in the evaluation process is no more than was done by Plaintiff's own medical providers. For example:

1.  In 2001 PA Fogle questioned Plaintiff's functional capacity exam and complaints of cervical trapezius pain in light of his clinical observations and findings to the contrary. R. 488 (P. 5 hereof).

2.  PA Fogle's 2001 notes that Plaintiff dismissed physical therapy as not doing any good and complained on more left shoulder pain at the same time the therapist and medical staff were releasing her to return to work at light duty and at the same time Plaintiff could not recall, when asked, if the left shoulder pain was the area of her original worker's compensation injury. R. 487 (P. 8 hereof).

3.  Plaintiff's July 2001 stated reluctance to go through a work hardening program and that she would think about going back to work in the fall. R. 483-486 (P. 9 hereof).

4.  Plaintiff's 2004 rejection of physical therapy stating "she would like to wait on that as she has tried physical therapy in the past without success." R. 497 (P. 12 hereof).

5.  Plaintiff's discharge from physical therapy after five (5) visits because of her lack of compliance. R. 424-433 (P. 17 herein).

With respect to pain, the Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

In Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the

ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that,

in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence,

make credibility determinations, or substitute its judgment for that of the Commissioner.

In Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1984), the Fourth Circuit held:

> . . ., the ALJ did not just rest on the absence of objective proof of pain. In an extended, comprehensive discussion, he cited many additional reasons, all derived from the circumstances of Mickles' everyday life, for finding her testimony not credible.
>
> . . .
>
> (3) Mickles used only relatively mild over-the-counter medication for her joint pain, . . . .

The only fair way to weigh a subjective complaint of pain is to examine how the pain affects the routine of life. *See Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted).

The Fourth Circuit has long recognized that daily activities may support the Commissioner's determination of non-disability. Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). The court emphasized the importance of daily activities by stating that "[t]he only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994).

A claimant's failure to use medications or treatment support the Commissioner's finding that the underlying condition was not severe. 20 C.F.R. § 416.929(c)(3)(iv); Mickles v. Shalala, 29 F.3d 918, 929 n.8 (4th Cir. 1994) (concurring opinion). An "inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility." Id.

Clearly, "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). The failure to comply with treatment recommendations supports the ALJ's inference that a claimant's symptoms are not as severe as asserted. Hunter v. Sullivan, 993 F.2d 31 (4th Cir.1992). Simply stated, a claimant must follow prescribed treatment to be entitled to social security benefits if the treatment will restore the ability to work. 20 C.F.R. § 404.1530. Accordingly, a claimant's repeated missing of appointments may tend to support a finding that her impairments are not as severe as alleged. Pitman v. Massanari, 2001 WL 435685, 7 (W.D.N.C. 2001) (citing Gross, supra, 785 F.2d at 1166; and Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)).

A careful review of the ALJ's decision convinces the undersigned that the AALJ performed his duties by applying the correct legal principles under <u>Gross</u>, <u>Hunter</u>, <u>Pittman</u>, <u>Mickles</u>, <u>Hays</u>, <u>Craig</u> and the regulations and properly evaluated the longitudinal record in this case. The evidence in theat record substantially supports the ALJ's conclusions. *Id.* Even Dr. Kline declined to express an opinion that the degree of impairments he found on March 23, 2007 were the same as those that Plaintiff claimed on October 19, 2004 or that the ones he found on March 23, 2007 could be expected to last for at least twelve (12) months. R. 729-736. If any fault be found with the ALJ's decision, it is that the ALJ did not "sugar coat" his findings and conclusions.

3.  <u>Hypothetical Question</u>

Plaintiff appears to complain that the following question to the VE contained restrictions unsupported by the record:

"If we a person of the same age, education, and work experience as claimant, but assume a person who's able to do, say, light work as that's defined in the Commissioner's regulations, but there would be no climbing ladders, ropes, scaffolds, stairs, or ramps; no more than occasional balance, stoop, kneel, crouch, or crawl. The person should be able to ***change positions briefly, by briefly I mean just a minute or two,*** at least every half hour, and there should be no, no exposure to temperature extremes and no exposure to significant workplace hazards like heights or dangerous moving machinery. There would be no detailed or complex instructions and no close concentration or attention to detail for extended periods of time. The work should not involve, and no fast paced, wait a minute, no, no work with the general public and no close interaction with coworkers or supervisors. Would such a person be able to do the past, any of the past relevant work?" (Emphasis Added).

The VE responded that Plaintiff could not do past relevant work but there was light level

36

work she could do and proceeded to identify that work. R. 907.

Plaintiff's counsel modified the hypothetical on cross examination by changing the sit stand option to an at will sit stand option meaning that Plaintiff would change from sitting to standing or standing to sitting every 10 to 15 minutes which, in the VE's mind would preclude all jobs. R. 910.

Plaintiff also appears to complain that the ALJ did not adopt the restrictions noted in the Physician's Questionnaire and include them in his hypothetical to the VE. The undersigned must assume Plaintiff is referring to the March 23, 2007 questionnaire completed by Dr. Kline.

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's

limitations, the VE's response thereto is binding on the Commissioner.  Edwards v. Bowen, 672 F.

Supp. 230, 235 (E.D.N.C. 1987).  The reviewing court shall consider whether the hypothetical

question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala,

10 F.3d 1080, 1085 (4th Cir. 1993).

The ALJ is only required to adopt limitations supported by the relevant evidence of record.

The ALJ simply did not believe the subjective complaints of disability made by Plaintiff.  There is

no evidence in the medical record of this case aside from Plaintiff's subjective complaints that

supports Dr. Kline's March 23, 2007 assessment.  Accordingly, the ALJ adopted only those

limitations supported by the medical and other objective evidence in the record.  Dr. Lauderman's

RFC assessment of December 1, 2005 concluded Plaintiff could sit with normal breaks for 6 out of

8 hours and could stand or walk about 6 hours out of 8.  R. 589-597.  He included a limitation in the

hypothetical to the VE and the VE testified to the light duty jobs available to a Plaintiff with those

limitations.

The longitudinal record in this case contains substantial evidence supporting the limitations

used by the ALJ in his hypothetical question to the VE.  For instance:

1.      Frank Roman's 2006 mental residual functional capacity assessment supports the
        hypothetical.  R. 608-621.

2.      Lois Holloway's 2005 assessment supports the hypothetical.  R. 598-603.

3.      Dr. Thomas O. Lauderman's physical residual functional capacity assessment dated
        December 2005 supports the hypothetical.  R. 589-597.

4.      Plaintiff's discharge from physical therapy because she had significant improvement in her
        functions and control and had returned to her pre-onset level of activity without modification

38

supports the hypothetical. R. 434-442.

5.      Dr. Franyutti's physical residual functional capacity assessment of 2005 supports the hypothetical. R. 405-412.

6.      Dr. Sabio's 2005 physical evaluation of plaintiff supports the hypothetical. R. 400-404.

7.      Dr. Serrato's 2005 examination and physical findings concerning Plaintiff supports the hypothetical. R. 330-331, 415.

8.      The documented inconsistencies between Plaintiff's subjective complaints and the objective clinical findings and test.

9.      The documented daily activities of Plaintiff including her work as an elder care giver.

The undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's inclusion of the ability of Plaintiff to ***change positions briefly, by briefly I mean just a minute or two,*** at least every half hour as well as the other limitations he found into the hypothetical question to the VE. I further find substantial evidence supports the ALJ's rejection of Dr. Kline's limitations.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's applications for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 15] be **GRANTED**, Plaintiff's Motion for Summary Judgment, or in the Alternative Remand [D.E. 12] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to United States District Judge Frederick P. Stamp, Jr. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 28th day of August, 2009

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE